IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM RODRIGUEZ, | ) | |
| Plaintiff-Claimant, | ) | |
| | ) | |
| vs. | ) | No. 11-CV-5637 |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | Jeffrey T. Gilbert |
| Social Security, | ) | Magistrate Judge |
| | ) | |
| Defendant-Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant William Rodriguez ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"), in which the Commissioner denied Claimant's application for Disability Insurance Benefits and Supplemental Security Income. This matter is before the Court on Claimant's motion for summary judgment or remand [Dkt.#15], and the Commissioner's opposing motion for summary judgment [Dkt.#17]. Claimant raises the following issues: (1) whether the Administrative Law Judge ("ALJ") erred in failing to analyze Claimant's seizure disorder in his Listing Analysis; (2) whether the ALJ failed to properly analyze evidence of Claimant's limitations when determining his Residual Functional Capacity ("RFC"); and (3) whether the ALJ improperly determined Claimant's credibility. For the following reasons, Claimant's motion for summary judgment is granted, and the Commissioner's motion is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Memorandum Opinion and Order.

# I.    BACKGROUND

## A.  Procedural History

Claimant initially filed applications for Disability Insurance Benefits and Supplemental Security Income on May 27, 2008 alleging a disability onset date of September 5, 2007. R. 56. The Social Security Administration ("SSA") denied Claimant's applications on September 23, 2008. R. 56. Claimant then filed a request for reconsideration, which the SSA denied on February 13, 2009. R. 56. On March 23, 2009 Claimant requested a hearing before an ALJ. R. 56.

On September 17, 2009, the ALJ presided over a hearing at which Claimant was represented by an attorney.  Only Claimant and a vocational expert William J. Schweihs testified. R. 56. No medical testimony was heard. R. 56. Post-hearing, Claimant's counsel forwarded to the ALJ additional evidence which was added to the record. R. 56.

On March 4, 2009, the ALJ rendered a decision finding that Claimant was not disabled within the meaning of the Social Security Act. R. 56-65. Specifically, the ALJ determined that Claimant "has the residual capacity to perform light work, as defined in 20 CFR 404.1567(b) and 416.967(b), subject to postural limitations precluding climbing ladders, ropes, or scaffolds, or more than occasional climbing of ramps and stairs; and also a limitation against more than frequent handling and fingering with right upper extremity and a need to avoid concentrated exposure to work hazards, such as unprotected heights or dangerous moving machinery." R. 60-61. The ALJ also found that a significant number of jobs existed in the national economy such that one of Claimant's age, education, work experience, and RFC would be able to "transfer his knowledge of electronics components to 3,000-4,000 sales attendant jobs in the Chicago area." R. 64.

Claimant filed a request for review by the Appeals Counsel. R. 11. On July 1, 2011 the Appeals Counsel denied that request. R. 1. That left the ALJ's decision as the final decision of the Commissioner. *Id*. On November 2, 2011 Claimant filed this action for review pursuant to 42 U.S.C. §405(g).

**B. Hearing Testimony – March 9, 2010**

    1. **Claimant William Rodriguez**

At the time of the hearing, Claimant was 52 years old.  He is divorced from his wife and has two children ages 25 and 18. R. 20.  Claimant graduated from high school and then graduated from DeVry Institute of Technology Trade School. R. 20. At one time, Claimant was licensed by the State of Illinois for commercial alarm installation. R. 21. Claimant also took courses in advanced digital theories and alarms. R. 21.

Claimant testified that most of his past work experience was as an industrial electrician. R. 22. The job consisted of repairing industrial equipment and included heavy lifting. R. 22, 38. Claimant testified that he sometimes had to move by himself equipment that weighed 300 or 400 pounds. R. 38. Claimant also testified that he left his job as an industrial electrician on September 5, 2007 because of the mental breakdowns he was having during the job and the physical pain that was impeding him from doing his work. R. 23. Claimant testified that his bosses and some of the workers said that there was something wrong with him and that he was not mentally fit to do the job. R. 23. After leaving the job, Claimant went to see the neurologist Dr. Wang. R. 23. He testified that the doctor helped him in some ways but that he had limited access to doctors because he lacked insurance. R. 24.

Claimant testified that in the last 15 years he had a number of jobs similar to his job as an industrial electrician. R. 24. The lightest job he did was troubleshooting computer systems but it

required a lot of thought and strained his mind. R. 38. When he worked at UPS as a maintenance electrician, he was hired to troubleshoot about the first half of a new facility in Willow Springs. R. 39. The ALJ reminded Claimant that he also worked as a maintenance worker for a cleaning contractor, but Claimant testified that he could not remember that job. R. 24. When the ALJ asked Claimant if there was any reason why he had so many jobs, Claimant replied that it was due to his drug addiction. R. 24. Claimant testified that he has not used drugs in three and a half years. R. 24.

Claimant testified that since he left his job as an industrial electrician he has not done any work. R. 21. He tried doing lawn work a month prior to the hearing which involved cutting the grass and mowing. R. 21-22. He worked for two and a half hours and then his wrists swelled up and his lower back started hurting. R. 22. Claimant testified that he tried lawn mowing three or four times in the past year. R. 22.

Claimant testified that he still gets seizures and that they are happening more frequently. R. 25. He used to get a seizure once a week, but in the year before the hearing, they increased to three a week. R. 25. Claimant also stated that even though he takes the medicine he still gets his seizures. R. 25. In June 2009, Claimant's medical records at the Greater Elgin Family Care Center reveal that Claimant reported he was having seizures two to four times a week. R. 468. (R. 62 at ALJ's decision).

Claimant testified that he can't always remember when he gets his seizures but friends that live around him tell him that he still gets seizures. R. 25. Claimant testified that some seizures are like a short circuit in his brain during which he sees nothing but a red circle and sun and all his memory is blocked out. R. 26. Sometimes he can't see anything. R. 26. Claimant testified that if he goes into a store where there is a lot of light he can lose his balance and his

eyesight. R. 26. Claimant testified that he also can get a seizure when he is under a lot of stress and then he blanks out and is like a zombie. R. 26. Claimant testified that after he gets a seizure it takes him about 15 minutes to recuperate and to get back to what he was doing before. R. 36.

Claimant testified that he has orthopedic problems from when he fell 20 feet to the ground in 2004. R. 26. Claimant stated that he fell head first and when he tried to block the fall with this hands he broke his wrist and tore a ligament on both of his elbows. R. 26. Since the fall, Claimant's elbows and wrists swell up and he developed severe arthritis in his wrists. R. 27. Claimant, however, testified that he left his job for mental reasons and because of the seizures. R. 27. Claimant testified that he can lift 10 to 20 pounds but then his right wrist and both elbows swell up and he gets severe lower back pains. R. 28. Claimant also testified that having to bend his back or put strain on his lower back will hurt. R. 35. His back also will hurt if he lifts himself up or if he sits for too long. R. 35. Claimant testified that he discussed his back problems with the doctors at the Greater Elgin Family Care Center. R. 35. Claimant also testified that he went to a doctor prior to that and the doctor did all kinds of x-rays and an analysis. R. 35. Claimant testified that the doctor was the first one that found out that Claimant had back problems, but the doctor was too expensive and Claimant could not afford him anymore because he has no insurance. R. 35-36.

Claimant also testified that he can walk for about 45 minutes but has to rest. R. 28. Claimant stated that he is taking a few medications but, except for Zoloft, he cannot remember their names. R. 28. He testified that he sometimes forgets to take them. R. 28. Claimant testified that the medications give him diarrhea and make him very drowsy. R. 29. Claimant stated that he is not seeing a doctor regularly because he has no insurance. R. 29. When he has medical

problems he goes to a free medical clinic, the Greater Elgin Family Care Center, but sometimes it will be a month and a half before he can get to see a doctor. R. 29.

Claimant testified that he lives alone and is able to take care of himself to a certain extent. R. 29. Once a week someone from the Greater Elgin Center comes to his house to check if he has food, to help him with his medication, to check his apartment, to see if he is drinking or doing any drugs and to see if he needs help with something. R. 34. Claimant testified that his neighbors sometimes invite him to eat in their apartment. R. 35. Claimant testified that he has a difficult time cooking. R. 29. He only makes simple meals because, if he tries to do anything difficult, he makes a mess and gets confused, so he stays away from doing anything that requires a lot of thinking. R. 30. Claimant testified that there is a store four blocks from his home to which he can walk. R. 30. He does not go the store alone to buy groceries, and if he needs to go, his friends will take him. R. 30. Claimant also testified that he is sometimes able to do the laundry but only when the amount is very little because he can't carry a lot. R. 31. Claimant also testified that he once left the stove on. R. 34. He also left the water running which twice flooded the apartment downstairs and he came close to being kicked out of his apartment. R. 34. Claimant testified that he sometimes leaves the doors to his apartment open when he leaves the house. R. 34.

Claimant testified that the government is paying for his housing. R. 31. Claimant also testified that he does not have a driver's license because a few years ago he was caught speeding, and his license was taken away. R. 31. He spends most of his time during the day visiting friends, watching the news and reading the Bible or magazines. R. 31. Claimant testified that only sometimes is he able to get through an article when reading a magazine. R. 34. The majority of the time he just glances through and reads the important parts. R. 34-35. If he reads too much, more than 15 or 20 minutes, he gets bogged down and mentally tired. R. 35. Claimant testified

that he takes naps during the day, sometimes three of them, and has problems sleeping at night. R. 33. He takes naps when he is getting volatile, stressed out and cannot cope. R. 33. Claimant also testified that he has panic attacks when he is in a real stressful situation or when he is being pushed or being yelled at. R. 33.

Claimant testified that he attends counseling about four or five hours a week. R. 32. Although the counseling is helping him try to deal with situations, overall things are getting worse. R. 32. Claimant also testified that he is not able to get the full medical attention that he needs.  Claimant testified that he had a difficult time attending the hearing and does not have the access to help that he needs. R. 32-33.

### 2. Vocational Expert's Testimony

William Schweihs is a vocational expert ("VE") and testified at the hearing. He described Claimant's past relevant work as a skilled worker, essentially a maintenance mechanic for electrical and electronic equipment. R. 41. He also testified that most of Claimant's past work was at the heavy to very heavy range of physical exertion although there was a job or two at the lighter range such as when he worked as a custodian and janitor for the school district. R. 41. The VE testified that within the last 15 years there were only three years (2003, 2004 and 2005) in which Claimant's earnings did not reach substantial gainful activity levels.  R. 41. He testified that Claimant had some two dozen jobs early on in the past 15 years. R. 41. Only about a fourth of Claimant's jobs were full time; the rest were part time. R. 41.

The ALJ asked the VE what type of work a person with Claimant's work experience, age, education (three years beyond high school), and residual functional capacity, could perform, if any, with the following limitations: working only in light sedentary work; avoiding climbing ladders, ropes of scaffolds or more than occasional climbing of ramps and stairs; avoiding

concentrated exposure to hazard, and only frequent handling and fingering with the right hand. R. 42-43. The VE testified that based on the hypothetical given by the ALJ, an individual with the limitations described could perform only the cleaning type of work such as the custodian or janitor for a school district. R. 43. Claimant's other past work would have been beyond the light range of physical exertion. R. 43.

The ALJ then asked the VE if there would be any transferable acquired work skills or semi-work skills. R. 43. The VE testified that knowledge of electrical and electronic components and procedures followed within the industries would transfer to semi-skilled positions, such as sales attendant, counter attendant, full-sale and retail hardware and electronic supply stores. R. 43. The VE added that in the metropolitan of Chicago, at least 3-4,000 of those jobs are at the light range of physical exertion. R. 43.

The ALJ then asked the VE a follow-up question modifying the hypothetical and adding additional restrictions: a moderate limitation in the ability to maintain attention and concentration for extended periods; a moderate limitation in the ability to complete a normal work day and work week without interruptions from psychologically-based symptoms and a moderate limitation in the ability to perform at a consistent pace without an unreasonable number and length of rest periods. R. 43-44. The VE responded that based on the revised hypothetical with the additional limitations there would still be 3-4,000 jobs at the light range of physical exertion which the individual would be able to perform. R. 44.

For the next hypothetical, the ALJ instructed the VE to assume that Claimant's testimony at the hearing is fully credible and an accurate depiction of the hypothetical person's capabilities and limitations, and asked the VE what the vocational outlook of that person would be. R. 44. The VE responded that he does not believe that a person would be able to work full-time

competitive positions or really any positions with the symptoms and the limitations that Claimant described, in particular the memory problems; the inability to cope at times; having to take naps during the day;  having panic attacks and episodes of heavy memory blackout; having heavy duress for 15 minutes to recover from each episode at times; an inability to drive or maintain a schedule; or to repetitively use one's hands because of the swelling. R. 44.

### C.  Medical Evidence

#### 1.   Medical Offices of Michael D. Gross. M.D., S.C.

On July 26, 2006, Dr. Gross examined Claimant. R. 394. Dr. Gross indicated that Claimant injured his right wrist and hand and his lower back, at work, on or about November 5, 2004. R. 398. Claimant fell, head first, approximately 16 feet. R. 398. Claimant hit his chest, bounced, and hit the right side of his head twice, and he was unconscious for about two minutes. R. 398. Claimant was taken to the Sherman Hospital emergency room. R. 398. Claimant did not have insurance so he could not get physical therapy. R. 398. Claimant also had memory problems following the injury for about eight months. R. 398. Claimant had to go to the hospital, about four times, due to severe low back and rib pain, and memory loss. R. 398. A complete inspection of the right hand and wrist revealed atrophy of the right abductor pollicus brevis muscle; restriction of the right wrist motions, as compared to the left, and nerve dysfunction. R. 398-399. X-rays of the right hand and wrist showed bone deformity with osteopenia of the carpal bones. R. 399.

A comprehensive examination revealed that all low back motions were limited. R. 399. The examination also revealed diminished sensation on the lateral aspect of the right thigh, indicating nerve disfunction. R. 399. Dr. Gross assessed that Claimant's right wrist and lower back injuries were causally related to the accident that occurred on November 5, 2004. Dr. Gross

concluded that Claimant has a major loss in the use of the right wrist, a moderate loss in the use of the right upper extremity and a moderate loss of the use of the man as a whole, on an industrial basis. R. 400.

### 2. Midwest Physical Therapy

Claimant was seen in physical therapy from January 16, 2007 through February 19, 2007 for a total number of 13 treatments. R. 263. On January 16, 2007 Claimant was examined by Dr. Snehal Patel. R. 273. Dr. Patel indicated that Claimant has arthritis in his right wrist along with carpal tunnel syndrome in his left wrist complex. R. 273. He also indicated that Claimant suffered from a general ache. R. 273. Claimant rates it at its worst at 6/10. R. 273. On February 2, 2007, Claimant was examined by Dr. Julie Plautz. R. 271. Dr. Plautz's report indicated that although Claimant demonstrates mild progression he continues to demonstrate a significant fatigue reaction with bilateral upper extremities with any repetitive activity, which increases pain in his forearms. R. 271. Dr. Plautz also noted that Claimant demonstrates significant limitations with his ability to complete work related tasks and to complete activities of daily life without pain. R. 271. On June 25, 2007, Dr. Derek Shields wrote a concluding report that stated that Claimant demonstrated mild progression with therapeutic exercise but continued to report fatigue, pain and difficulty with repetitive activity. R. 263.

### 3. Chicago Institute of Neurosurgery and Neuroresearch

On May 22, 2007, Dr. Charles Wang examined Claimant. R. 291. Dr. Wang noted that Claimant suffered from severe forgetfulness, missed appointments and could not fulfill his jobs. R. 291. Claimant returned for a follow-up visit on June 8, 2007. R. 288. Dr. Wang's notes dated June 18, 2007, indicated that an EEG performed on May 22, 2007, revealed sharp waves on the left temporal area. R. 288. On May 30, 2007, Claimant had an MRI of the brain which revealed a

few punctate abnormal T2 signals in the subcortical white matter. R. 288. Dr. Wang concluded from Claimant's test results and examination that Claimant has a history of a concussion with some post-concussion syndrome. R. 288. Further, Claimant suffers from memory loss and episodic incoherence and other episodic symptoms, suggesting incoherence and spacing out or zoning out. R. 288. Dr. Wang stated that he thinks that Claimant has a complex partial seizure disorder and recommended Claimant refrain from driving, swimming or climbing ladders. R. 288-289.

On August 5, 2009, Claimant returned to see Dr. Wang. R. 487. Dr. Wang opined that he had not seen Claimant since June 8, 2007. R. 487. Claimant told Dr. Wang that he was taking Trileptal but had stopped taking the medication because he wanted to continue working as an electrician without the side effect of possible drowsiness. R. 487. Dr. Wang also noted that Claimant had problems with memory and his mind was acting too slowly. R. 487. Because he sometime slept for 11 hours, Claimant was diagnosed with depression and prescribed Zoloft. R. 487. Further, Dr. Wang's report indicated that two and a half to three months prior to Claimant's August 5, 2009 visit, Claimant began to have increased spacey symptoms and zone out for 10 seconds. R. 487. At one time, Claimant's mind was blank for about 15 minutes. R. 487. Claimant stated that he had seen a doctor who prescribed Dilantin 100 mg t.i.d. However, he had not started or filled a prescription and is therefore not on any anticonvulsant. R. 487. Dr. Wang again advised Claimant not to drive, climb any ladders or swim alone. R. 488.

### 4. Sherman Hospital

There are Sherman Hospital records for Claimant dating from February 7, 2007 through August 27, 2007. R. 301-307. The records dated February 7, 2007 indicated evidence of a bilateral tunnel syndrome of a mild degree. R. 306. Records dated April 24, 2007 indicated that

Claimant's CT scan of the brain was normal. R. 306. Dr. Stephen Grossman, the treating physician, noted that he does not see any cause for the patient's headaches on this study. R. 306. Records dated May 30, 2007 indicated that Claimant had an MRI scan which showed that a few punctuate abnormal T2 signal foci were visualized scattered in the subcortical white matter in both cerebral hemispheres. R. 304. It also showed a large left maxillary retention cyst. R. 305.

### 5. Associates in Orthopaedic Surgery

Dr. S.W. Mox examined Claimant in 2007 and 2008. R. 331-332. Records dated January 1, 2007 indicated that Claimant suffers from right wrist arthritis, post traumatic left wrist strain, right carpal tunnel syndrome and left carpal tunnel syndrome. R. 332. On February 2, 2007, Dr. Mox assessed that Claimant is still having carpal tunnel symptoms in both hands, worse on the right than on the left. R. 332. Dr. Mox also indicated that Claimant may continue working as tolerated, wearing wrist splints at night. R. 332. On February 26, 2007, Dr. Mox reported that Claimant's pain is mostly as a result of the arthritic area in the wrist and that Claimant has trouble with lifting at work. R. 331. Records dated April 3, 2007 indicated that Claimant has definitely improved in terms of both elbows and the right wrist. R. 33. Dr. Mox examined Claimant again on May 12, 2008 and reported that Claimant still complained of pain over the wrist area and both lateral epicondyles. R. 331. Dr. Mox's assessment was that Claimant has mild right wrist arthritis and mild bilateral lateral epicondylitis. R. 331. Dr. Mox recommended that no work restrictions be put on Claimant at any time. R. 331.

### 6. Ecker Center for Mental Heath – Comprehensive Mental Health Assessment

On December 18, 2008, Dr. Alicia Martin examined Claimant. R. 371-382. Her assessment report indicated that Claimant has a major medical and pain management problem for which he has already made connections with a local health clinic. R. 376. The assessment report

also indicated that Claimant has a history of head injury. R. 381. Dr. Martin noted that Claimant suffers from mood disorders, cognitive disorders and pain disorders associated with his general medical condition. R. 381. She also indicated that Claimant would benefit from medication but prefers not to be on an antidepressant. R. 381. Claimant also has polysubstance dependence (alcohol, heroin, cocaine) in sustained full remission. R. 381.

On January 22, 2009, Dr. Martin performed a psychiatric evaluation on Claimant. R. 406. Dr. Martin's report indicated that Claimant testified that he had used drugs, which resulted in his divorce. R. 406. Claimant also stated that he saw a neurologist in 2007 due to a worsening of his memory problems and seizures. R. 406. However, he had taken the prescribed medicine only for a short period of time because he was unable to pay the cost and because of drowsiness. R. 406. Claimant testified that his memory has gotten worse and that he does not remember the names of actors and others and how to do his job as an electrician. R. 406. Claimant also stated that he has problems with concentration and focusing. R. 406.

Dr. Martin assessed that Claimant has Mood Disorder, NOS; Cognitive Disorder, NOS; and Polysubstance Dependence, in sustained full remission. R. 408. Dr. Martin testified that Claimant suffers from a history of head trauma; a seizure disorder; a pain disorder, associated with medical condition; arthritis; is legally blind in his right eye and has stomach problems. R. 408. Claimant also has problems with primary support, unstable housing, financial difficulties, unemployment and lack of health insurance. R. 408. Dr. Martin opined that Claimant would benefit from medication but that at this time Claimant testified that he prefers not to be on an antidepressant. R. 408.

On March 12, 2009, Claimant had a follow up visit with Dr. Martin. R. 411. Claimant stated that he had decided to follow treatment recommendations, particularly taking

antidepressants to help relieve depression. R. 411. Claimant agreed to take Zoloft 25 mg daily for 6 days and increase it to 50 mg daily thereafter. R. 411. However, Dr. Martin's notes from April 30, 2009 indicated that Claimant only started taking Zoloft 25 mg on April 30, 2009, even though the prescription was given to him on March 2, 2009. R. 415. She also noted that Claimant indicated that he did not experience any intolerable side effects. R. 415.

     **7. Consultative Examination for the Bureau of Disability Determination Services**

On July 31, 2008, Dr. Roopa K. Karri examined Claimant for the Bureau of Disability Determination Services ("DDS"). R. 336. Dr. Karri noted that Claimant was able to get on and off the exam table and could walk 50 feet without support. R. 336. Claimant could also make fists and oppose fingers, turn doorknobs, write and pick up coins. R. 336. Dr. Karri concluded that Claimant has a history of arthritis in his hands and tendonitis in the elbows with decreased strength in the right hand. R. 336. Dr. Karri further noted that Claimant has low back pain with normal range of motion and a history of anxiety and memory problems. R. 336. Dr. Karri determined that Claimant has a questionable seizure disorder. R. 336. Claimant gets seizures one to four times a month. R. 334. When Claimant gets a seizure he feels incoherent for about 30 seconds to 2 minutes. R. 334. Dr. Karri opined that Claimant had memory problems for four years and loses his sense of direction all of a sudden. R. 334. Dr. Karri also noted that Claimant has a history of right eye strabismus and is legally blind. R. 336.

On August 26, 2008, Dr. Barbara F. Sherman also examined Claimant for the DDS. R. 340. Dr. Sherman's summary and diagnosis report indicated that Claimant alleges that since his fall at work he has suffered from seizures and behavioral change as well as a perception of cognitive decline. R. 343-342. The mental status examination showed Claimant to be fully oriented. R. 344. Claimant's speech was clear and coherent. R. 344. Claimant also acknowledged

signs of clinical depression. R. 344. The cognitive screening suggested deficits for attentional focus, basic fund of information and conceptual thought. R. 344. Claimant's judgment is impaired when he is very anxious. R. 344.

### 8. State Agency Physicians

Records dated September 12, 2008 indicated that although Claimant reported difficulty concentrating, his Activities of Daily Living ("ADL") form was extensively completed with extra pages added for details. R. 357. The ADL form is hand-written despite Claimant's statements of difficulty with pain in his wrists. R. 357. Dr. Lionel Hudspeth, Psy.D., the examining doctor, opined that there is no indication of any treatment nor any medication for a mental disorder. R. 357. Dr. Hudspeth also noted that Claimant's cognition/memory and thought processes are all intact. R. 357. There is some indication that Claimant suffers from some anxiety. R. 357.

Records dated September 22, 2008 indicated that Claimant alleges seizures since his fall in 2004, stating that he has them up to 4 times a month. R. 360. The examining doctor, Dr. Charles Kenney, reported that Claimant reports constant pain in his hands and forearms that causes difficulty with dressing and lifting "much of anything." R. 362. Dr. Kenney determined that Claimant's statements of limitations are only partially credible. R. 362.

On February 6, 2008, Dr. Calixto Aquino examined Claimant. R. 386-393. Dr. Aquino noted that Claimant's physical limitations as indicated by Claimant appeared somewhat consistent with current objective evidence. R. 393. Claimant indicated limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stairs climbing, seeing, and using his hands in addition to multiple mental limitations. R. 393. Dr. Aquino opined that Claimant appears only partially credible because the severity of the physical impairments is not

fully supported by the medical record. R. 393. Dr. Aquino also noted that Claimant is noted to be partially credible on the mental portion of the claim and thus, appears to be partially credible overall. R. 393.

**D.  The ALJ's Decision – December 4, 2009**

After a hearing and review of the medical evidence, the ALJ determined that, from September 5, 2007 through the date of his decision, Claimant was not disabled, as defined by the Social Security Act. R. 64. The ALJ evaluated Claimant's application under the required five-step sequential evaluation process. R. 57-65. At step one, the ALJ found that Claimant has not engaged in substantial gainful activity since September 5, 2007, the alleged onset date of disability. R. 59. At step two, the ALJ determined that Claimant has severe impairments of osteoarthritis, bilateral carpal tunnel syndrome, and histories of epicondylitis, and a concussion with partial complex seizures. R. 59.

At step three, the ALJ determined that Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404.1520(d). R. 60. The ALJ determined that Claimant has not had a severe mental impairment on or after the alleged onset of disability, noting that the record fails to establish more than minimal limitations in his ability to perform basic mental work activities. R. 59. In making this determination, the ALJ considered Dr. Martin's psychiatric evaluation of Claimant in January 2009 and in her monthly meetings with him thereafter. R. 59. The ALJ also found relevant to this determination the fact that Claimant has not sought psychiatric treatment in the past and was not taking medication for mood instability despite evidence that medication improves his conditions. R. 59. In addition, the ALJ noted that Claimant reads the newspaper, does errands, cares for his personal needs, makes sandwiches and frozen dinners, shops 2 hours

at a time for food, handles money, does laundry, uses public transportation, watches television, likes to read the Bible and attends church regularly. R. 60. The ALJ further indicated that Claimant has a history of substance abuse in remission. R. 59. Claimant was noted to have sought out and purchased Vicodin through any means and "without evidence of a readiness to change." R. 59.

The ALJ concluded that because Claimant's medically determinable mental impairment causes no more than "mild" limitation in the three functional areas (set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments) and has not caused even one episode of decompensation of extended duration, Claimant does not have a severe mental impairment. R. 60. Thus, Claimant's impairments in the context of the Listings do not manifest clinical signs and findings that meet the specific criteria of any of the Listings. R. 60.

The ALJ then proceeded to consider Claimant's RFC[1] and found that the Claimant has the RFC to perform light work, "subject to postural limitations precluding climbing ladders, ropes, or scaffolds, or more than occasional climbing of ramps and stairs; and also a limitation against more than frequent handling and fingering with right upper extremity and a need to avoid concentrated exposure to work hazards, such as unprotected heights or dangerous moving machinery." R. 60-61. In making the RFC determination, the ALJ indicated that he considered Claimant's symptoms to the extent that they could reasonably be accepted with the objective medical evidence and other evidence as required by 10 C.F.R. 404.1529 and 416.929 and SSRs 96-4p and 96-7p. R. 61. The ALJ also indicated that he considered opinion evidence in

---

[1] The RFC is the most that a claimant can do despite the effects of her impairments. 20 C.F.R. 404.1545(a).

accordance with the requirements of 20 C.F.R. 404.1527 and 416.927 and SSRs 96-2p, 96-5p and 06-3p. R. 61.

The ALJ considered Claimant's head injury and right wrist fracture. The ALJ adopted the opinion of Dr. Roopa K. Karri, the DDS consultant, who reported that Claimant could make fists and oppose fingers, turn doorknobs, write and pick up coins. R. 61. The record shows that Claimant's back examination and neurological and gait examinations were within normal limits and that the treating orthopedist placed no work restrictions on the claimant. R. 61-62. The ALJ then proceeded to consider Claimant's medical seizures. In May 2007, Claimant was evaluated at the Chicago Institute of Neurosurgery and Neuroresearch by Dr. Charles C. Wang. R. 62. An EEG indicated a complex partial seizure disorder. R. 62. Dr. Wang's impression was that Claimant suffered from episodic symptoms that caused incoherence and "spacing out" or "zoning out." R. 62. At a consultative examination in July 2008, Claimant was assessed by Dr. Karri with a "questionable seizure disorder." R. 63. In August 2009, following Claimant's visit, Dr. Wang was asked "if seizure disorder exists, indicate frequency." R. 62. Dr. Wang replied with a question mark and added that the Claimant would need a functional capacity examination to determine limitations.

Claimant repeatedly reported suffering from recurring seizures. In July 2008, at the consultative examination, Claimant reported 1 to 4 seizures a month, which occurred while driving, when he felt incoherent for about 30 seconds to 2 minutes. R. 63. On June 15, 2009, approximately a year after the consultative exam, Claimant reported that his depression was well controlled but he was having seizures 2 to 4 times a week and did not know the names of his medications. R. 62. The record shows that at this time Claimant was to start Dilantin and advised not to drive. R. 62.

The ALJ found Claimant's allegations regarding the limiting effects and the severity of his symptoms only partially credible and determined that Claimant retains the ability to work at a light level of exertion – as restricted by certain limitations noted in the opinion. R. 63. The ALJ then noted that although medication controls Claimant's seizure disorder and depression, Claimant consistently failed to take the required medications. R. 62-63. Claimant reported having stopped taking the medication back in July 2007 because it made him drowsy and because he wanted to continue with his electrician work. R. 62.

At step four, the ALJ concluded that Claimant is able to perform past relevant work. R. 63. In making this determination, the ALJ considered the vocational expert's testimony that a hypothetical person having claimant's vocational factors, work experience, and the residual functional capacity found for him would be able to perform past work as a school custodian. R. 63. The vocational expert testified that Claimant's work as a maintenance mechanic and maintenance trouble shooter of electronic equipment was skilled and very heavy. R. 63.

At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Claimant can perform. R. 63. In reaching this determination, the ALJ gave consideration to Claimant's residual functional capacity, age, education, and work experience, in conjunction with the Medical-Vocational Guidelines at 20 C.F.R. Part 404, Subpart P, Appendix. R. 63. The ALJ also accepted the testimony of the vocational expert that an individual with the claimant's right-handedness, age, education, work experience and residual functional capacity could transfer his knowledge of electronics components to 3,000-4,000 sales attendant jobs in the Chicago area. R. 64. Thus, the ALJ concluded that Claimant was not disabled under the Social Security Act from September 5, 2007 through at least the date of this decision. R. 64.

## II.  LEGAL STANDARD

### A.  Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-107 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id*. Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching her decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge between the evidence and the result." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial evidence to support

the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing. 42 U.S.C. § 405(g).

## B. Disability Standard

Disability insurance benefits are available to a claimant who can establish that she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue,* 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order: (1) whether Claimant is engaged in substantial gainful activity; (2) whether Claimant has a severe impairment; (3) whether Claimant's impairment meets or equals a listed impairment; (4) whether Claimant can perform past relevant work; and (5) whether Claimant is capable of performing other work. *Id.* Once Claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the national economy that Claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

**III. DISCUSSION**

Claimant argues that the ALJ's decision denying his applications for Disability Insurance Benefits and Supplemental Security Income should be reversed or remanded because it contained errors of law and is not supported by substantial evidence. Claimant raises the following issues in support of his motion for summary judgment: (1) whether the ALJ failed to analyze Claimant's seizure disorder in his Listing Analysis; (2) whether the ALJ failed to properly analyze evidence of Claimant's limitations when determining his RFC; and (3) whether the ALJ improperly determined Claimant's credibility.

**A. The ALJ Failed To Analyze Claimant's Seizure Disorder In His Listing Analysis**

When making a Listing Analysis, the ALJ must determine whether the claimant's impairments or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. A partial complex disorder such as the one Claimant was diagnosed with should be considered under Listing 11.03, which provides that a claimant who experienced seizures more than once weekly in spite of at least three months of treatment meets or equals the Listing. 20 C.F.R., Part 404, Subpart. P, Appendix. 1 §11.03.

In considering whether a claimant's condition meets or equals a listed impairment, "an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). An ALJ "must minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). An ALJ, however, "need not specifically articulate why a claimant falls short of a particular listing unless the claimant has presented substantial evidence that she meets or equals the listing." *Alesia v. Astrue*, 789 F. Supp.2d 921, 932 (N.D. Ill. 2011). In *Alesia*, the court held

22

that because the claimant provided only scant explanation of how she equals a specific listing and her initial brief failed to identify any specific listing the ALJ should have considered, the claimant failed to present substantial evidence that she meets or equals the listing. *Alesia*, 789 F. Supp.2d at 933. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett*, 381 F.3d at 668.

Here, the ALJ's Listing Analysis is cursory at best, or so it appears at least from the manner in which the ALJ articulated that analysis in his written decision. The ALJ failed to identify by name the specific listing he considered as relevant to Claimant's partial complex seizure disorder. Even if we were to infer from the ALJ's written decision that he correctly recognized the applicability of Listing 11.03 to Claimant's seizure disorder, however, his one sentence Listing Analysis fails to explain why Claimant fell short of the listing. R. 60. The Commissioner argues that, as in *Alesia*, the ALJ did not need to specifically articulate why Claimant fell short of Listing 11.03. Commr.'s Br. [Dkt.#18], at 4. Here, however, in contrast to *Alesia*, not only does Claimant's initial brief identify the specific listing the ALJ should have considered, but the record also contains some evidence in support of Claimant's claim that his partial complex seizure disorder meets the listing. The record establishes that, at least in 2009, Claimant's seizures increased in frequency and occurred two to four times a week, even when Claimant was compliant with medication. R. 25-26, R. 468.

In *Barnett*, the Seventh Circuit noted that even though the record "does not establish an average of one seizure per week over the entire course of the treatment" it does "establish an upward trend in the frequency and severity of Barnett's seizures" and the ALJ was wrong to disregard it. 381 F.3d at 669. Similarly, in the instant case, although the record does not establish an average of one seizure per week over the entire course of Claimant's treatment, it

does contain evidence that, as of 2009, Claimant's seizures increased in their frequency to more than once a week. The ALJ's failure to articulate *any* legitimate reason for his decision to disregard evidence establishing an increase in Claimant's seizures makes it impossible for us to know whether he considered it in his analysis and, if he did, what his reasons were for rejecting it.

The Commissioner also argues that Claimant had not been compliant with prescribed treatment measures and therefore failed to satisfy the listing criteria. Commr.'s Br. [Dkt.#18], at 6. However, "evidence of non-compliance proves nothing; what matters is whether there is a link between the noncompliance and the ongoing seizure episodes." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). Additionally, an ALJ must take into consideration Claimant's reasons for failing to take medications such as his inability to cover associated costs and the powerful side effects of the drugs. *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 669, 679 (7th Cir. 2008).

Here, the ALJ did not properly explore the cause of Claimant's non-compliance with his prescribed medication. Evidence in the record establishes that Claimant could not cover the associated costs of treatment because he lacked health insurance and that the medications made him very drowsy. R. 29, 341, 344; 379-80, 398; 412; 453. The ALJ failed to address these factors in mitigation of Claimant's non-compliance with medication. The Commissioner further argues that although the record establishes that Claimant did not have health insurance, Claimant was able to obtain free medical care at the Elgin Family Care Center. Commr.'s Br. [Dkt.#18], at 1. While the record establishes that Claimant visited the Elgin Family Care Center on multiple occasions, it does not establish that Claimant's access to free medical care allowed him to cover the costs associated with filling his prescriptions. R. 280-85; R. 465-81.

For all of these reasons, we conclude that the ALJ's finding that Claimant's impairments fail to meet or equal a listed impairment is not supported by substantial evidence. This matter is therefore remanded for further proceedings consistent with this Opinion.

**B. On Remand, The ALJ Should Revisit The Issue Of Claimant's Residual Functional Capacity**

At the fourth step of the requisite five step disability analysis, the ALJ is required to determine the RFC of a claimant. *See* 20 C.F.R. §404.1520(a)(4)(e). An ALJ makes a RFC determination by weighing all the relevant evidence of record. 20 C.F.R. §404.1520(a)(1). Here, the ALJ found that Claimant had the RFC to perform light work (as defined by the regulations) subject to postural limitations precluding climbing ladders, ropes, or scaffolds, or more than occasional climbing of ramps and stairs. R. 60. He also found a limitation against more than frequent handling and fingering with right upper extremity and a need to avoid exposure to concentrated work hazards. R. 60-61.

Claimant argues that the ALJ's decision did not include an adequate analysis of several of Claimant's impairments and their limitations. Claimant's Br. [Dkt.#16], at 6. An ALJ must articulate his analysis at some minimal level to permit an informed review of his decision. While an ALJ is not required to address every piece of evidence or testimony, an "ALJ may not ignore an entire line of evidence that is contrary to her findings." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

Here, the ALJ's RFC analysis only mentions the medical evidence favoring the denial of benefits. It, therefore, is not possible to determine whether the ALJ considered the record as a whole. Although ample evidence in the record established Claimant's right eye blindness, the ALJ failed to include any discussion or analysis of Claimant's right eye blindness in his RFC determination. R. 291, 361, 483. The ALJ also did not expressly analyze the full impact of

Claimant's bilateral carpel tunnel syndrome and arthritis. The ALJ relied on Dr. Karri's report that Claimant could make fists, turn doorknobs, write and pick up coins. R. 61. He also mentioned Dr. Mox's report which noted that Claimant showed excellent range of motion of the elbows, excellent right wrist motion, and no motor atrophy in the hands or elbows, and placed no work restrictions on Claimant. R. 61-62. However, it appears the ALJ failed to consider seemingly contrary evidence such as Claimant's complaints of constant pain and swelling in both of his hands and wrists, and his difficulty in lifting objects and completing work-related tasks. R. 26-28, 178-179, 189, 193, 195, 197. Medical evidence in the record establishes that Claimant suffers from carpal tunnel syndrome and arthritis in his right wrist and continues to demonstrate a significant fatigue reaction in his bilateral upper extremities with any repetitive activity. R. 263, 271, 276-277, 307, 334, 400, 471. Thus, the ALJ ignored or at least failed to acknowledge an entire line of evidence which appears contrary to his findings and failed to explain why the evidence in the record, which appears to favor Claimant, was overcome by the evidence on which the ALJ relied.

Additionally, the ALJ's RFC determination neglected to discuss whether and to what extent Claimant's memory loss placed any limitations on his ability to work. The record establishes that Claimant constantly forgets things, has difficulty completing tasks, is limited in preparing a full course meal because he cannot think properly and cannot read much because he forgets what he reads. R. 189-93, 207, 222. Claimant also testified that he left the water running in his apartment, twice flooding the apartment downstairs, that he once forgot the stove on, and that he leaves the doors to his apartment open when he leaves the house. R. 34. Also here, the ALJ did not provide any legitimate reason for discrediting Claimant's testimony regarding his memory loss and the effect this has on his ability to carry out his daily activities.

Finally, the ALJ's RFC determination does not include any discussion of the effects of Claimant's partial complex seizure disorder on his ability to carry out his daily activities and work related tasks. Claimant testifies that his seizures cause him to become incoherent, blank out, act like a zombie and lose consciousness. R. 26, 208. The Commissioner argues that Claimant's seizures considered separately are not of sufficient severity to be disabling. Commr.'s Br. [Dkt.#18], at 4. But the "regulations require the agency to consider the combined effect of all the claimant's ailments, regardless of whether any such impairment, if considered separately, would be of sufficient severity." *Clifford*, 227 F.3d at 873; see 20 C.F.R § 1523.

For all these reasons, we cannot find that the ALJ's RFC determination is supported by substantial evidence on the present record. It is thus necessary to remand the case to allow the ALJ further opportunity to explain the basis for his RFC determination.

## C. On Remand, The ALJ Should Revisit The Issue Of Claimant's Credibility

Claimant argues that the ALJ improperly evaluated his credibility and that the ALJ's findings lack the support of substantial evidence. When a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by the objective medical evidence, the ALJ must evaluate the credibility of a claimant's testimony based on the record as a whole. SSR 96-7p. The ALJ is in the best position to determine the credibility of witnesses, and this Court affords the ALJ's credibility findings special deference. *Bell v. Apfel,* 221 F.3d 1338 (7th Cir. 2000). However, it is not sufficient for the ALJ to make a single conclusory statement that a claimant's allegations are not credible. SSR 96-7p. The basis for an ALJ's credibility determination must be "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Zurawsk*i, 245 F.3d at 888.

When it comes to assessing an ALJ's credibility determination, a court must first determine whether the ALJ's determination regarding a claimant's credibility is "sufficiently specific" and supported by evidence in the record. *Id.* "Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight." *Id.* Thus, an ALJ's credibility determination will not be sustained by a court when the ALJ does not consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p. When an ALJ's credibility determination is sufficiently specific, courts will then review it deferentially, overturning it only if it is patently wrong. *Skarbeck v. Barnhart,* 390 F.3d 500, 504-05 (7th Cir. 2004); *Zurawski, 245 F.3d 888; Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

Here, we lack a sufficient basis to sustain the ALJ's credibility determination based on the current record. The ALJ found Claimant only "partially credible" yet failed to provide specific reasons for his finding on credibility. R. 63. The ALJ summarized the medical evidence, including the fact that Claimant was not always compliant in taking prescribed medication, and concluded summarily "claimant's allegations regarding the limiting effects and the severity of his symptoms are only partially credible." R. 63. Although the ALJ says this finding is based on "examination of the Claimant's medical records as a whole, consideration of the factors presented at 20 C.F.R. § 404.1529(c)(3), 416.929(3)(3) [sic] and Social Security Ruling 96-7p, and of the claimant's testimony," this boilerplate recitation leaves a reviewing

court clueless as to the actual basis for the ALJ's finding that Claimant is only "partially credible." R. 63.

We are not able to tell from the ALJ's credibility determination, for example, whether he examined the full range of evidence in the record and, if he did, how he evaluated evidence that does not support his conclusion. For example, the ALJ determined that "the record shows that medication controls [Claimant's] seizure disorder and depression" but failed to make any reference to Claimant's testimony that he continued to experience seizures even when compliant with treatment. R. 61. Even if it is true that medication controlled Claimant's seizure disorder and depression, however, the ALJ does not seem to have considered the reasons for Claimant's noncompliance with medication. In *McClesky v. Astrue*, the Seventh Circuit overturned an ALJ's credibility findings when those findings were based on Claimant's refusal to comply with medication without taking into consideration that "these are expensive and powerful drugs that many people are reluctant to take or unable to afford." 606 F.3d 351, 352 (7th Cir. 2010).

Additionally, the ALJ's determination that Claimant's activities "indicate that his orthopedic impairments are not of a severity to be disabling" and therefore undermine his credibility (R. 61), is also problematic without more explanation. The Seventh Circuit has "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Craft*, 539 F.3d at 680. In *Craft*, the court held that the ALJ was wrong to conclude from Craft's ability to "prepare meals, make his bed, clean his apartment, take walks and shop for groceries" that those activities "belie his assertion of incapacity" without considering "how Craft copes with his daily activities." *Id*. Similarly, in *Zurawski*, the court held that Zurawski's daily activities such as washing dishes, helping his children prepare for school, doing laundry and preparing dinner, are

not "a sort of that necessarily undermines or contradicts a claim of disabling pain." *Zurawski*, 245 F.3d at 887.

Like in *Zurawski* and *Craft*, here Claimant's daily activities do not necessarily undermine his credibility. The ALJ's reference to Claimant's daily activities such as reading the newspaper, doing errands, caring for his personal needs, making sandwiches and frozen dinners, watching television, reading the Bible and attending church regularly, is insufficient, without more, because it fails to consider how Claimant copes with his pain during the daily activities. R. 61. The record indicates at this point, for example, that Claimant has a difficult time cooking and eats only simple meals because, if he tries anything difficult, he gets confused; that Claimant does not go to the grocery store without assistance; and that Claimant is usually only able to glance through a magazine because if he reads for more than fifteen or twenty minutes, he becomes mentally exhausted. R. 29; 30; 34-35. The ALJ does not seem to factor these matters into his credibility finding.

Accordingly, the ALJ's determination does not contain sufficiently specific substantive reasons for his finding on credibility. The Court cannot determine on this record whether or not the ALJ's finding is patently wrong. It is therefore necessary to remand the case to allow the ALJ further opportunity to explain the basis of his adverse credibility determination.

## IV. CONCLUSION

For the reasons set forth in the Court's Memorandum Opinion and Order, Claimant William Rodriguez's motion for summary judgment [Dkt.#15] is granted, and the Commissioner's motion [Dkt.#17] is denied. The decision of the Commissioner of Social

Security is reversed, and this matter is remanded to the Social Security Administration for further proceedings consistent with the Court's Memorandum Opinion and Order.

It is so ordered.

_____
Jeffrey T. Gilbert
United States Magistrate Judge

Dated:   November 30, 2012